Harold P. Mintz, Esq.
100 Old Palisade Road
Plaza Level - 14
Fort Lee, NJ 07024
Tel:  201-944-7500
Fax:  201-944-7525
Cell: 917-215-9232
hmintz@goldeneye.net

United States District Court – District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street Room 4015
Newark, New Jersey 07101

|  |  |
|---|---|
| | ) Case No.: |
| | ) |
| | ) COMPLAINT FOR DAMAGES AND |
| KANGAPODA CORPORATION; and | ) INJUNCTIVE AND DECLARATORY |
| HAROLD P. MINTZ, individually | ) RELIEF AND DEMAND FOR JURY |
| and as Founder and President, | ) TRIAL; SUMMONS |
| | ) |
| Plaintiffs, | ) 1. Tortious Interference with |
| | )    Contractual Relations |
| vs. | ) 2. Conspiracy |
| | ) 3. Intentional Infliction of |
| FACEBOOK, INC.; and MARK E. | )    Emotional Distress / |
| ZUCKERBERG, individually and | )    Negligent Infliction of |
| as Founder and CEO, | )    Emotional Distress |
| | ) 4. Antitrust |
| Defendants. | ) 5. Punitive Damages |
| | ) 6. Proximate Causation |
| | )    Opportunity Loss |
| | ) 7. Attorney's Fees |
| | ) 8. Declaratory and Injunctive |
| | )    Relief |

<u>COMPLAINT</u>

    Comes now Plaintiffs, KANGAPODA CORPORATION and HAROLD P.

MINTZ to allege against the Defendants as follows:

<u>INTRODUCTORY ALLEGATIONS</u>

This action is brought against Defendants for damages as well as declaratory and injunctive relief for tortious interference with contractual relations, conspiracy, intentional/negligent infliction of emotional distress, antitrust, punitive damages, proximate causation opportunity loss, and attorney's fees, for the malicious, unconscionable, retaliatory, and conspiratorial destruction of Kangapoda's property and successful social media program.

<u>PARTIES AND JURISDICTION</u>

1.    Plaintiff Kangapoda is a Corporation organized under the laws of the State of New Jersey with an address of 100 Old Palisade Road Plaza Level-14, Fort Lee, New Jersey 07024. Plaintiff Harold Mintz is an individual with an address of Fort Lee, New Jersey.

2.    Defendant Facebook is a Corporation organized under the laws of the State of California with an address of 1 Hacker Way, Menlo Park, CA 94025. Defendant Zuckerberg is an individual with an address of Palo Alto, California.

3.    The District Court has jurisdiction over all counts of this complaint pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the sum of seventy-five thousand dollars

($75,000), exclusive of interest and costs, and there exists diversity of citizenship in that Plaintiffs and Defendants are citizens of different states.

4.   Venue is proper in this district, pursuant to 28 U.S.C. §1391, because part of the events or omissions giving rise to the instant claims occurred within this district and because Plaintiffs are located in this District.

5.   Plaintiff KANGAPODA CORPORATION ("Kangapoda", or "the Company") is and at all times herein relevant was a registered corporation that, among other things, was formed for the production and sale of ergonomically superior bed top coverings that incorporate a patented foot canopy built into the top coverings so that an individual has room for his or her feet when lying on his or her back under the tucked in covers watching TV, reading, texting, resting, or sleeping.

6.   Plaintiff HAROLD P. MINTZ ("Mr. Mintz", "the Company's Founder" or "the Company's President") is and at all times herein relevant was the New Jersey entrepreneur who determined room for the feet under the covers is vital. As is true with most early entrepreneurial concerns, the Company's Founder and the Company are inextricable. Accordingly, at all times herein, the Company and the Company's Founder will collectively be referred to as "Plaintiff" in this complaint.

7.     Defendant FACEBOOK, INC. ("Facebook") is and at all times herein relevant is a registered corporation that, among other things, is the world's most significant social networking communication service. Defendant Facebook does its internet business nationwide and globally.

8.     Defendant MARK E. ZUCKERBERG ("Mr. Zuckerberg"} is and at all times herein relevant was the Founder and Chief Executive Officer of Defendant Facebook. Defendant Mr. Zuckerberg controls Defendant with an iron fist. Defendant Mr. Zuckerberg has direct knowledge of this matter and either directly ordered and oversaw much of the tortious activities and / or ratified and acquiesced in the unconscionable actions of other of Defendant's personnel. Accordingly, at all times herein, Defendant Facebook and Defendant Mr. Zuckerberg will collectively be referred to as "Defendant" in this complaint.

<u>FIRST CLAIM FOR RELIEF</u>

(Tortious Interference with Contractual Relations)

9.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 8, above, as though fully set forth herein.

10.    Plaintiff is an entrepreneurial company that has designed and patented ergonomic top sheets and blankets which

incorporate a built-in foot canopy, so the feet have room to lie comfortably under the covers.  The ergonomic canopy lies flat like a bed scarf when not in use and expands and drapes the feet rather than pressing against them when you lie under the covers on your back.

11.   This is in stark contrast to the uncomfortable status quo where a plain flat top sheet and blanket make no accommodation whatsoever for the feet. And, as we all know, the feet naturally rest at a near right angle and having your toes pressed against a taut flat top sheet (and blanket) is irritating. This is the reason so many people either untuck the plain flat top sheet each night or have ceased using one altogether.

12.   Foot comfort under the tucked in covers is more important than ever before because people use the bed far differently today than they once did. Approximately 90% of people have a TV in the bedroom; and, according to a National Sleep Foundation poll, at least 60% of Americans watch TV right before falling asleep. Further, most everyone has a smart phone. When you are in bed, watching TV, using your smart phone, or reading, you are likely reclined on your back in a typical 'viewing' position with your head and shoulders supported by pillows and your feet naturally maintaining a right angle with the toes pointing toward the ceiling.

13.   In a viewing position, the toes are forced directly

against the plain flat top sheet in the tightest and most unyielding location — where the sheet is tucked in (around a big heavy mattress) at the foot of the bed. The tightness of the tucked-in plain flat top sheet affects almost every person every single night. Whether they cope with the discomfort by turning their feet outward or by pointing their toes in order to maintain a neat tucked-in bed, or they untuck the covers altogether so their feet can lie comfortably, the discomfort of a taut flat top sheet remains a constant issue. The fitted bottom sheet was initially regarded as an indulgence. Its clear superiority saw it become a standard.

14.   While the flat sheet's pressure is annoying to many, for those with arthritis, diabetic neuropathy, foot, toe, and lower leg injuries where the foot must be maintained at a right angle to heal, those susceptible to calf cramps, and back-sleepers and back-nappers, this downward pressure is often intolerable. Kangapoda is so much more comfortable that once you have experienced room for your feet, you will never want to be under the covers without having such room.

15.   Plaintiff has carefully case-studied companies such as Spanx, The Snuggie, and MyPillow, as it projects it has this type of broad-based potential. MyPillow sells over $300M/year of ground up Styrofoam pillows. MyPillow went from revenue of $1M to over $200M within 2 years because they developed traction. Spanx started

with pantyhose with the feet cut off so one can wear them with sandals and benefit from their shaping qualities. From that humble Spanx became a leader in shaping garments doing $400M+/year. The Snuggie – essentially a backwards fleece bathrobe - became a pop culture phenomenon. Traction is what is so important. Getting going.

16.    We spend a third of our lives in bed. The pandemic and sequester has reinforced how essential TV time from bed is. Plaintiff felt social media/Facebook was a strong and pragmatic way to start spreading the Kangapoda word since comfort in bed is of daily importance to everyone and that syncs well with social media's daily grassroots reach and appeal.

17.    A grassroots social media effort also made sense as the KANGAPODA brand name is catchy, distinctive, descriptive, and fun. It is memorable, friendly, and pleasing to the ear. The prefix Kanga- is from the famous marsupial and -Poda is from the Latin 'those with feet'. So, Kangapoda sheets and blankets incorporate a patented pouch (ergonomic canopy) for the feet. Plaintiff's social media strategy, at its most basic, is to get the Kangapoda brand name and ergonomic message out there.

18.    People are spending more and more time on Defendant Facebook's site. In fact, mobile data users spend approximately 75% of their browsing time on Defendant Facebook. People can find a business web site online, and they can also find its Facebook

page. Business web sites now allow you to sign in using their Facebook connect option, just further adding to the level of involvement Facebook has with so many people.

19.    Defendant Facebook so dominates and controls social media (and Defendant Facebook owns Instagram and WhatsApp too), it is a social media monopoly. If a business intends to be serious, it must get serious with Defendant Facebook.

20.    Defendant Facebook has taken on such importance that a lack of presence or following reflects negatively upon a company. The effective deployment of social media marketing to build social media traction to reach and interact with your customers and other stakeholders has become so compelling for businesses that many leading universities now offer curriculums and degrees in the discipline.

21.    What all businesses utilizing Facebook seek and hope for is that a steady, creative, incremental, social media drumbeat can prime the pump so that, when quality content and good karma align, a message can 'go viral' and become popular amazingly fast amongst a large group of people by circulating quickly from person to person over the internet. However, pending that explosive event, steadily building your community of interested Followers ("Fans" or "Followers") and keeping them engaged is vital.

22.    What has emerged, as a social media scorecard, is the concept and number of 'LIKES' that participants on social media

have. Every participant on social media is both attracted to and driven by the nuber of Likes that content receives. The more Likes the better. It is human nature - not solely good business. Everyone likes to be liked. The more Likes, the more excitement.

23.    New Likes show positive momentum and constitute social validation of a page or site; and new Likes keeps things fresh. The number of Likes serves as something of a benchmark to the outside world signaling a critical mass and helping outsiders make the visceral decision that if so many others Like something I can (and perhaps should) Like it too. Likes also demonstrate traction – a vital business point of indicia.

24.    Having a high number of Likes has such significant ramifications that an industry has emerged where companies offer pay by the pound services to in effect manufacture Likes for customers. Pay more and we will get you more Likes. They even have pricing tables depending upon how many Likes you desire to purchase.

25.    Defendant Facebook has reshaped itself to be a pay to play social media site. Defendant Facebook continuously prompts its customers to boost posts/ads. In fact, this is what Defendant Facebook states in its web site: "Boosted posts appear higher in News Feed and on Instagram, so there's a better chance your audience will see them."   Defendant makes a fortune getting companies to boost ads to hopefully generate more Likes and more

interest. Boosting is vital to being successful on Defendant Facebook.

26.    On or about August 2020, Defendant, seeking to increase the profile and presige of the boost, created "'Boost With Facebook' Connect Support Grow Apply to join the Leaders Network".

27.    Procedurally, when you boost an ad, you must: (i) determine / set your target audience (e.g., states, cities, male, female, age, etc.); (ii) allocate your budget based on how many people you want to reach; and (iii) decide how long you would like your boost to run. If ads are performing well, one may continue to add money to extend running the ad and its reach although the target audience parameters are locked in place.

28.    By way of example, Plaintiff ran two nearly identical ads one with a small boost of $20 on May 5, 2016 and the other without any boost on June 18, 2016. The one with the small boost reached 7,873 people and received 947 Likes, 11 shares, and 11 coments. The un-boosted ad – which Plaintiff feels was the superior ad – reached only 245 people with 25 Likes and 1 comment. Boosting is indeed a powerful tool.

29.    Vast numbers of people are logged into their Facebook accounts every day. In fact, they often are on their Facebook accounts multiple times each day. In contrast, people do not log into specific vendors' web sites every day. With the go viral possibility of social media, Facebook can be even more important

than the official web site.

30.    Booosting is a critical component of a company's social media strategy. Ergo, anything Defendant can do and does to manipulate or sabotage the fair and proper functioning of the paid for boost function in any manner, shape, or form is deleterious and tortious.

31.    A clever, fun, whimsical, and sophisticated, social media campaign can keep the comfortable feet under the covers message on Followers' minds; and they can look forward to their daily dose of foot comfort under the covers fun. Consider how we look forward to our daily (often many times a day) doses of Geico, Liberty Mutual, State Farm, Progressive, Aflac, and AllState.

31.    Plaintiff felt that a strong presence on Facebook was vital. Moreover, it was a cool, current, grassroots way to lay the foundation for other initiatives. Plaintiff determined to develop a competence in social media and devoted itself toward this goal.

32.    Incrementally, Plaintiff began to strategize, experiment, and progress down the social media learning curve to design and refine its social media campaign. Plaintiff concluded, after carefully studying all kinds of advertising, that social media and Defendant Facebook was a different thing from the corporate e-commerce web site with different goals and objectives.

33.    In this era of hyper-quick attention spans and immediate

gratification, why would people be interested in something in the first instance let alone come back? The 'hook' has always been important. Today, more so than ever.

34.   Plaintiff conjectured that its social media campaign must not be a one-shot thing. Rather, it must be a steady drumbeat — an ongoing affair. Plaintiff began doing 2 posts a day – the first at 5AM and the second at 5PM. Plaintiff wanted the posts to jibe with the seasons, the holidays, current affairs, music, sports, television, gossip, animals, nature, deaths, achievements, red, white, and blue, etc.

35.   Plaintiff designed a social media strategy that would be fun, memorable, whimsical, topical, current, innovative, relevant, and thought-provoking. Plaintiff worked diligently not only at identifying interesting pictures but also at finding the proper story in the picture — and then telling that story in the ad copy and adjoining captions and comments. Plaintiff had a four-person team focused on the design, structuring, and implementation of the contests.

36.   Plaintiff carefully examined and studied magazine covers from a host of major publications including Vogue, Women's Health, Cosmopolitan, GQ, FHM, Allure, W, Esquire, Most Fitness, Maxim, Rolling Stone, Shape, Entertainment Weekly, Lui, Flare, Harper's Bazaar, Glamour, V, Elle, Entertainment Weekly, New York, Sports Illustrated, Ocean Drive, Paper, Self, Advertising Age, Vaity

Fair, Marie Claire, Then National Enquirer, Star, People Magazine, and ESPN The Magazine among many others for insights and guidance regarding what people are interested in.

37.   Plaintiff also carefully studied the content at the New York Post's Page 6, The Daily News' gossip section, The National Enquirer, Star Magazine, and People Magazine to see what these major publications offered their readers to encourage a daily check in. Plaintiff, of course, also researched what was catching eyes on the internet.

38.   Arguably, the cover is even more important than the content inside, as it grabs the initial attention. But the image is just the starting point. For an ad to be well-received, there needs to be a message that works well with the photo. Selecting the photo; seeing the story in the photo; framing the photo; telling the story you see in the photo in a cute and memorable way; selecting the font and colors for the ad copy; determining whether other effects (e.g., shadows, reflections, etc.) improve the presentation; positioning the ad copy in relation to the picture; positioning the logo; altering the color of the logo to better match and/or stand out; and many other details contribute to an ad's overall effectiveness.

39.   Selecting photos is not easy. It is art. It is a feel. It is visceral. What photo is going to not only capture attention but also reinforce the product message involves being a

storyteller. There are so many photos that are examined and ultimately disgarded.

40.    Plaintiff's clever, researched, captions also reflect a commitment to excellence. Writing quality captions is a time-consuming, detailed undertaking, particularly to do in a thoughtful and classy way. Plaintiff incorporated smart discussions regarding physiology of the feet, medical conditions, obituaries, TV programming, movies, concerts, sports, healthcare, holidays, etc. with each of the ads. While the effort is great, Plaintiff feels the reward is commensurate. It is a form of competitive differentiation and critical value add. The captions are integral to tying the entire ad together. To give an idea of the difficulty of writing captions, no less a social media expert than Kim Kardashian has said the most difficult thing for her is coming up with good captions.

41.    Designing and composing the ad is a major undertaking, but it is just the start. The ad must then be uploaded and scheduled. If it is going to be boosted, the parameters of the boost must be determined as well as how much money is being allocated to the boost. If you desire integration with the web site and Instagram, this too must be set up. After all of this, the ad must be followed up and reacted to. Those who respond to an ad with comments must be responded to. Newcomers who show their approval by Liking posts must be invited to Like the page. If an

ad is popular, one needs to assess whether to add more money to the boost to expand its reach and better leverage it.

42. The result was a fun, compelling, well-thought-out, well-balanced, stylized, and well-integrated ad flow where people enjoyed seeing the ads and smiling at the playful and whimsical, sometimes LOL-connection Plaintiff made between the photo and having more comfortable feet under the covers.

43. During 2015, Plaintiff began to execute on its strategy. Almost immediately, Plaintiff was confronted by Defendant's arbitrary, unilateral, and unregulated censorship whereby an ad was not allowed to be boosted simply because it had an attractive person. The rejection would come with a boiler plate comment "Your ad was disapproved because...ads with a sexual undertone are not allowed."

44. Plaintiff would respond and appeal as per Defendant's on-line format and re-quest the ad be properly boosted. Defendant would generally do nothing and respond with further boilerplate. It was insulting. It was infuriating. And Plaintiff immediately recognized that there was something fundamentally improper occurring.

45. Defendant's bogus censorship was just the start. The moment Plaintiff took issue with Defendant's arbitrary and capricious actions – yesterday was OK but today is not OK just because - that were dramatically out of sync with mainstream,

Defendant would escalate its denials. Immediately, Defendant's actions demonstrated that any challenge to its assertions of unfettered, unilateral authority (essentially, we can do whatever we want whenever we want) would be punished.

46.   The array of sneaky and insidious ways that Defendant can and does manipulate the workings of its platform to punish and cram down its total authority is appalling and unconscionable. The sabotage presented below was non-stop, virtually daily (and sometimes multiple times each day), mean-spirited, granular, and devious. Plaintiff has diligently maintained an extensive legal file so there is accurate, detailed, documentation of Defendant's tortious actions over years. The following is but a sampling.

47.   On February 15, 2015, a boosted ad was performing very well. It had Reached 6,491 people and received 408 Likes and people were commenting how much they enjoyed the ad. Defendant killed the boost midstream. It was already approved.  It was doing well. And, they killed it.

48.   On or about July 2015, Plaintiff initiated a James Bond-themed campaign. Almost immediately, Defendant did not allow an ad with a photo of the iconic Ursula Andress from the movie *Dr. No* holding a conch shell. The ad copy cutely stated: 'The Plain Old Flat Top Sheet Has Finally Conched Out'.

49.   In addition to the ridiculousness of thwarting the boosting of the picture and turning Plaintiff's effort for that

day into garbage, Plaintiff's thoughtful caption was also completely wasted: 'Ursula Andress became famous as Honey Ryder, a shell diver, in the very first Bond movie *Dr. No* (1962). In what became an iconic moment in cinematic and fashion history, she rose out of the Caribbean Sea in a white bikini sporting a large diving knife on her hip. The scene made Andress the quintessential Bond girl, and Andress said that she owed her career to that white bikini. Visit Us: Www.Kangapoda.com'.

50.    On or about July 2015, Defendant used the same boilerplate to not boost Sean Connery doing a handstand in behind-the-scenes photos taken during the filming of *Dr. No*. Defendant refused to boost Barbara Carrera in her red patent leather outfit and hat as the villain Fatima Blush in 1983's *Never Say Never Again*. Defendant refused to boost Famke Janssen squeezing the wind out of Bond as Xenia Onatopp in 1995's *Goldeneye*. Defendant refused to boost the gold-plated victim in 1964's *Goldfinger.* It was non-stop harassment.

51.    Plaintiff cried foul and documented its responses to the boilerplate rejections. "You've got to be kidding. There must be some mistake. These photos are completely tame. They are from iconic classics. They are charming."

52.    Plaintiff knew this situation was profoundly perverse and the implications would extend well-beyond Plaintiff. Plaintiff also realized that Defendant is powerful with a sordid history of

lying and deceit that the Court must pay cognizance to. Plaintiff understood that capturing and maintaining clear documentation of this aberrant and tortious conduct was vital.

53.   Plaintiff repeatedly informed Defendant its actions were improper, damage was being incurred, and a legal file was being maintained based on the advice of counsel. Defendant's arbitrary unregulated actions are fundamentally improper. Plaintiff's ads were completely in sync with major publications, national TV, and public newsstands let alone the internet where content is viewed on personal password-protected devices or desktop computers and on password protected Facebook. Moreover, Plaintiff only targeted / boosted ads to adults between the ages of 25 – 65.

54.   By arbitrarily, capriciously, and punitively non-boosting and, even worse, by systematically un-boosting (suddenly stopping the boost mid-stream of) successful running ads in retribution, Defendant knowingly and hatefully destroyed these ads' efficacy.

55.   There is a psychology of Likes. Likes engender good feelings and growth. Likes beget more Likes. When an ad has more receptivity, it leads to more likes for Plaintiff's page. By negating good feelings and sabotaging the proper functioning of ads, Defendant stunted Plaintiff's campaigns' reach, energy, and success. Defendant knowingly and with malicious intent repeatedly upset the karma of Likes. Defendant by its actions unilaterally

and fundamentally undid positive energy and momentum and replaced them with negativity and stagnation.

56.   They did this repeatedly and Plaintiff cried foul repeatedly. This went on daily.  Day after day.  Week after week. Month after month. Over years and still continues.

57.   The message/interpretation received by fans is obstructed, mottled, and negative. Why did yesterday's ad garner 4,000 Likes, but today's ad which is superior have only 40 Likes? The proper answer is because Defendant, in retaliation and mean-spiritedness, refused to boost it. However, outsiders/Followers are not privy to whether something has been boosted or not. They just see that today's ad had far less acceptance than what occurred yesterday.

58.   Defendant repeatedly prevented Plaintiff from performing at its best. Defendant impaired the value of the campaigns and damaged the team's esprit des corps. Defendant knowingly signaled the fan-base in a negative manner repeatedly and intentionally.

59.   Most significantly, Defendant destroyed traction. Traction is vital to in any business. Time is traction and time is money. Time erodes on patents. Time erodes energy, finances, and excitement. And social media traction is a powerful indicator. Defendant understands the importance of social media traction for any business but particularly for entrepreneurial-driven businesses.

60.    By definition, any boost that is stopped and thwarted begs the questions: why was this ad suddenly stopped?; how could it have been approved in the first instance if it was improper?; and how can you possibly be allowed to stop something that has been approved and is doing well (let alone do something so vile and disruptive over and over again)?

61.    Even 1 single bogus stoppage when something is doing well could change the course of events. To do so continuously is just flagrant abuse. Who knows which of the ads that were not properly boosted in the first instance or tortiously stopped mid-stream would have captured the social media fancy and gone viral?!

62.    Importantly, while this hateful, draining, non-stop attack was being sustained, the last thing Plaintiff wanted was problems with Defendant. The record will clearly show that Plaintiff simply wanted to execute. Plaintiff repeatedly beseeched Defendant to relent. Over and over, please don't do this. Please stop harming us. Our stuff is fun and whimsical and beautiful we work really hard for it to be great. Please stop the sabotaging.

63.    On or about September 2015, Plaintiff determined to have a month-long promotion using Halloween as the centerpiece. It began preparing. Plaintiff carefully researched the history of Halloween and witches and created a campaign and contest leading up to Halloween 2015. After the outrageous episodes with the Bond-themed campaign, Plaintiff decided to use almost entirely cartoon

drawings of witches – other than Samantha in Bewitched and a few others – for the entire campaign.

64. Almost immediately, Defendant did not boost ads responding with its cavalier boilerplate. A cartoon witch flying right was not OK. However, a similar cartoon witch flying left was OK.

65. Plaintiff had spent a huge amount of time and money preparing for this campaign. Plaintiff wrote a very thoughtful note to Defendant trying to get Defendant to behave. "Witches have been part of our culture for at least 700 years . . . Lady Alice Kyteler, Ireland's earliest known accused witch, was condemned to death for using sorcery to kill her husband in 1324 . . . Kyteler escaped, and her maid was burned at the stake in her stead . . . Among the throngs of this year's trick-or-treaters, hundreds will be dressed like Miley Cyrus or a minion from "Despicable Me"...hundreds of thousands will be dressed as a 'witch'...repeatedly, the #1 costume for adults . . . Witches are so a part of the Halloween holiday. And sexy witches are of course irresistible and as much a part of the holiday as ghosts and pumpkins . . . Our audience is 25-65 and this is completely inconsistent with children. However, children directed programming offers lots of sex appeal (always has) including: Wonder Woman, Ariel in The Little Mermaid, Jasmine in Aladdin, Snow White, Anastasia, Tangled, Meatballs, Megan Fox in Mutant Ninja Turtles

2, Xena, Futurama, Josie and the Pussycats, Hello Nurse, Francine Smith from American Dad, Elsa in Frozen, Moana the Hawaiian Princess, Captain Planet, Even Tinkerbell for heaven's sake — take a look at what Tinkerbell wears . . . So we are very apropos for the holiday. Everything is clever. Everything is tied into Kangapoda . . . Thanks for your attention to this matter."

66.   Defendant was unmoved and responded once again with boilerplate. "Your ad was rejected because the image doesn't follow our ad policies..."

67.   But what is more disgraceful (and it would be laughable were it not so damaging) is the vast preponderance of the images used in Plaintiff's Halloween campaign were cute animations/cartoon drawings, not even photographs. There were also some pinup girl witches from the 1940s and 1950s and a *Bewitched* picture of Samantha and Darrin (Elizabeth Montgomery and Dick York) from the TV series (1964-1972). Said differently, the whimsical witch images were timid and playful with a hag or two thrown into the mix for fun and contrast.

68.   Yet, time and time again, Defendant did not allow ads to be boosted. A male witch in silhouette with his side exposed holding a black cat was not allowed. A cartoon witch on a broom with the caption "I may be a witch with attitude but I still care about my warlock's comfort under the covers" was not allowed. A two-tone cartoon witch dressed in orange and black was not allowed.

A couple of pin-up girl witches from the 1940s and 1950s were not allowed.

69.   It was relentless, ridiculous, mean-spirited, enervating, and intentionally injurious. Repeatedly, a post was allowed and then disallowed when it was doing well. How is that even possible? Defendant seemed to revel in turning something fun and positive into a nightmare day after day.

70.   Moreover, it always caused a troubling and expensive ripple effect. Daily, Plaintiff was thrust into a negative defensive, wasteful, posture where the social media team was reeling and scrambling. The daily attacks forced delays, destroyed excellent work product that would not be seen on a larger scale, and forced the need to redo and create new content which is difficult.

71.   Another profound and damaging aspect was to the social media team. It was insulting to have your time, effort, thought, and passion repeatedly flushed down the toilet. It was a form of bullying. We will do whatever we want to you because we are stronger than you and we enjoy preying on you.

72.   In spite of it all, Plaintiff's Halloween contest was a hit. Plaintiff's campaign was so well-accepted and well-liked – flying (fine . . . a witch pun) in the face of Defendant's ostensible reasons for causing so much non-stop grief –  that Modern Living with Kathy Ireland, the show hosted by the famous

supermodel who has become a fabulously successful businesswoman, contacted Plaintiff to be on the show. Dean Rotbart, an award-winning Wall Street Journal 'Heard on the Street' reporter who has become an expert on social media and entrepreneurship, was so impressed with Plaintiff's social media efforts, he interviewed Plaintiff's President Mr. Mintz on his Monday Morning Radio Podcast and told him he thought the campaign was brilliant and the Company had the potential to go public. See https://mondaymorningradio.wpcomstaging.com/2015/11/02/an-under-the-covers-report-meet-kangapodas-eclectic-founder/ The group responsible for the celebrity gift pavillions at the MTV Movie Awards, The ESPYs, and The Emmys asked Plaintiff to be in the gift bag / gift pavillion for the events. Plaintiff had clearly developed something special that was working.

73. Defendant repeatedly sabotaged the Invite Function. Plaintiff would run an ad, generate a large number of Likes, and be prevented from inviting people who Liked the ad to Like the page. A dialog box would appear on the screen saying "Too many invites sent . . . We're sorry, more invitations to like this Page can't be sent today. Please try again later. If you think you're seeing this by mistake, please let us know." In some cases, the box would appear after Plaintiff's team had invited only two or three persons; but in many cases, the box would come up immediately - day after day for a couple weeks - and Plaintiff had invited no

one at all (not a single person was able to be invited).

74.    The sabotaging of the Invite Function perhaps seems esoteric, but it is a vital function to a business using social media. Plaintiff would run an ad, generate a large number of Likes, and be prevented from inviting people who Liked the ad to Like the page.

75.    By not allowing invites to be sent to those that Liked an ad, Defendant caused enormous damage and destroyed the entire effectiveness of the boost. There is a strong correlation between immediately inviting a person who Liked an ad to Like the page and having him or her accept the invitation. So, by preventing Plaintiff from being able to invite persons who had Liked an ad to Like the page, Defendant undid the power of the boost — de facto bilking Plaintiff, the booster.

76.    This happened repeatedly, and Plaintiff cried out again and again via Defendant's online complaint system and directly via email. 'Why are you guys screwing with me I just don't understand. I wasn't able to send ONE invite for 4 out of 5 days. This too is now in my Legal File as I'm certain it is connected and you are determined to continue to harm me and Kangapoda for telling you your censorship is arbitrary and out of wack with any public news stand standards let alone to people's direct computers age 25 to 65. I hope and anticipate you are punished big time for the damage you have caused.'

77.   It got to the point, however, where it did not matter
what Plaintiff did. Defendant was crazed after being repeatedly
challenged by Plaintiff; and Defendant was determined to destroy
Plaintiff. Each time, Plaintiff would cry foul. "How can you
repeatedly stop successful boosts? How can you not allow us to
reboost an ad that was already approved?  You have sabotaged the
workings of the invite function so we cannot follow up with those
that Liked a post."

78.   Defendant Facebook has been described by its own
employees as functioning like a cult. "Former employees describe
a top-down approach where major decisions are made by the company's
leadership, and employees are discouraged from voicing dissent…"
Salvador Rodriquez, Inside Facebook's 'Cult-Like' Workplace, Where
Dissent Is Discouraged And Employees Pretend To Be Happy All The
Time, CNBC.com, (January 8, 2019).

79.   Defendant's employees are governed by the understanding
if they break rank and challenge anything openly, they will be
turned on with a dramatically negative impact on their career. It
is the perfect/sick HR environment where all kinds of disreputable,
sneaky, and illegal acts can be committed and not be properly
challenged by anyone internally. Just because someone is bright
and out of a good school does not mean that he or she is ready,
willing, or able to take on a corrupt superior with his or her job
security – and incredibly high median pay - at risk.

80.   This cult-like terror and fear of speaking out sheds greater light on the hateful, aberrant, fanatical bullying and non-stop reversals of already approved boosts. On information and belief, the proper, sane action would be taken – and the boost approved – and then it would be destroyed with the staff being unable to take on superiors committed to terrorizing Plaintiff.

81.   On or about November 26, 2015, Defendant hampered Thanksgiving by not boosting an ad with Raquel Welch in a magnificent seasonal outfit. It was a gorgeous, festive ad at a time when so many people are at home and working on their computers before or after the feasting, and Defendant would not boost it.

82.   On or about December 2015, Defendant prevented the boosting of so many ads during the lead up to Christmas 2015 it is not even practical to detail them all here. Plaintiff has them all maintained in its legal file for presentation.

83.   On or about December 28, 2015, a gorgeous ad of a flapper with a string of pearls – Let Us Give Some Pearls of Ergonomic Wisdom - was denied. It was approved and boosted and then suddenly stopped and rejected. Plaintiff appealed and won. Only for the ad to be suddenly shut down again. Defendant could not even get its sabotaging and conspiring in sync. It was so aberrant and evil.

84.   On or about New Years 2016, Defendant prevented a "Back to the Ergonomic Future" photo of a handsome, sheepish Joe Namath in a tuxedo on a date with a stunning Raquel Welch in a formal

gown. Plaintiff had boosted this for New Years, and it was accepted as it should have been. What a classic amazing date and New Years picture (for all the boomers, football fans, Jets fans, Raquel Welch fans, Joe Namath fans, New Yorkers, and Hollywooders, etc.). It had reached 6,487 people and then Defendant stopped the boost using the same boilerplate. Defendant just wanted to start the new year with a statement that it can and will do whatever it wants.

85.    On or about February 19, 2016, a boosted post with 10% Liking the Post (a statistically high number by Defendant's own metrics), was unboosted and killed by Defendant.

86.    On or about March 11, 2016, an ad that had reached 33,547 with over 2,000 Likes was suddenly and hatefully unboosted.

87.    Defendant even sabotaged the ability for Plaintiff to challenge Defendant's actions. They crippled the functioning of the appeal mechanism. Plaintiff would try to respond with Defendant's online appeal process, and it would not function. Plaintiff would draft the appeal in Defendant's form and then hit send and it would freeze – a wheel would spin and it would not allow Plaintiff to send the repnse.

88.    On or about February 4, 2016, an ad had reached 6,842 with 1,661 Likes (24.28% Liked the ad – a crazy high percentage) and Defendant killed it.

89.    On or about February 12, 2016, an ad "This is how the big toe feels under the tight covers" was approved, boosted,

reached 2,137 with 479 Likes (22.41% - a very high percent), and Defendant unboosted it to punish.

90.   On or about February 24, 2016, February 29, 2016 and March 1, 2016 ads were approved and boosted and then DISABLED and unboosted to retaliate and punish.

91.   On or about February 25, 2016, Plaintiff sent an email to Defendant with a picture of the winning couple from Dancing With The Stars holding the trophy in their winning costumes. "This is from *Dancing With the Stars* on prime time national TV. You guys got to cut the crap!"

92.   On or about March 11, 2016 an ad had reached 33,547 and garnered over 2,000 Likes and they stopped the ad.

93.   On or about March 20, 2016, a boost for 'Check Out The Feet at Rest' ad was requested a full day later it was denied when by Defendant's own policies they are to be approved or not in 15 minutes.

94.   On or about March 26, 2016 Defendant, citing its boilerplate, would not allow the boosting of an innocuous woman in PJs standing with a sleep mask around her head but not yet over her eyes with the headline 'Back Sleeping is Better with a Kangapoda.'

95.   The very next day, on or about Sunday March 27, 2016, Easter Day, Defendant unboosted an already accepted cartoon rabbit rolling an Easter egg with the headline 'Happy Easter'. Defendant

sent boilerplate stating: 'because it uses too much text'.

96.    Defendant had openly and wantonly destroyed Plaintiff's social media efforts, caused catastrophic damages for this entrepreneurial company with the better room for the feet mousetrap, and was gloating over its perceived absolute power and authority.

97.    On or about April 25, 2016 and for several weeks, Defendant prevented Plaintiff from going into Scheduled Ads. Plaintiff would click on the Schedule function and be met with a frozen screen and a non-stop spinning wheel preventing Plaintiff from taking any action. This happened day after day even when Plaintiff wanted to 'See Posts'. Defendant sabotaged the function. Plaintiff could not create new posts. Plaintiff could not schedule. Plaintiff could not add captions or dates. Plaintiff could not get to its data.  They disabled a critical function.  This was a next level warning shot, as Plaintiff unfortunately learned.

98.    On or about May 30, 2016, an ad that was first published and boosted on May 25, 2016, had reached 7,873 garnering 1,000 Likes (12.70%), and Defendant killed it!

99.    On or about July 9, 2016 Plaintiff appealed the stoppage of a boost and the appeal was approved and the ad started running again. The ad had 3.9K Likes out of 34,508 People Reached a robust 11.30% response - only for them to suddenly stop the boost again

and queer the invite function so we could not invite most of the 3,900 who Liked the ad to Like the Kangapoda page. This unconscionable, hateful, and tortious action wiped out momentum, timeliness, and interactivity (i.e., it killed the efficacy of a crazy successful ad).

100.  On or about August 8, 2016, Plaintiff had a successful ad running.  The original boost request had been accepted; and the ad had quickly garnered 766 Likes. Plaintiff decided to up the amount of money it was directing to this ad. We requested an upped boost and received approval at 7:52PM on or about August 7, 2016. Even though the ad was running at 5AM and it was now a full day later, on or about August 8, 2016, the upped boost had not been put into effect. Moreover, instead of upping the (already approved) boost as requested, Defendant killed the ad. This destroyed a potentially multi-thousand like ad. 19.34% LIKED this Ad. That is very compelling (766 Liked out of /3961 Reached) and Defendant killed it.

101.  Defendant fraudulently manipulated the boosts themselves – who they went to and the number they went to. Likes came from other countries when the boost was to men and women between the ages of 25 and 65 in the United States.

102.  Defendant's boosts themselves are unregulated and radically circumspect – who the go to, how they are selected, and the number reached. Moreover, when Plaintiff examined the Likes to

invite people who had liked the ad to like the page, in many cases, there was not a single new person — not one single new person was reached by the boost. How many other times did Defendant, even when allowing a boost, snicker behind dirty hands and pull a sneaky and not give Plaintiff its money's worth?

103.   On or about August 18, 2016, before they tortiously un-boosted and killed it, an ad reached 34,262 with 8,417 (24.57%) engaging for $63.  Yet, only 1 week later, on or about August 26, 2016, a similar ad reached only 2,434 (93% fewer people) for $74 (17.5% more money). This ad would have been a super high-performer as 1,428 Engaged out of the 2,434 reached (an extraordinarily high 58.67%).

104.   On or about August 18, 2016, an ad Foot Comfort is Very Important had 34,262 People Reached and had 8,417 Engagements (a 25% engagement rate is crazy good) and Defendant unboosted the ad and killed it.

105.   On or about August 18, 2016, Plaintiff's Page Likes grew to 3,890 and Plaintiff had added 138 new Page Likes that week. Plaintiff was social media marching as best it could. So, Defendant killed the boost.

106.   On or about August 26, 2016, an ad had 1,428 Engagements and 1,007 Post Likes out of 2,434 Reached – representing 58.67% Engagements and 41.37% Likes, respectively. That is statistically splendid. Defendant killed the ad.

107.  On or about September 28, 2016, the boost function was simply disabled by Defendant.

108.  On or about the 4rth quarter of 2016, Plaintiff could no longer boost ads. Defendant made it painfully clear that it would not allow Plaintiff to do so – and there was nothing you can do about it.

109.  Plaintiff's hard work, diligence, creativity, and follow up was appreciated despite Defendant's relentless sabotage.

110.  This is highlighted by a diagnostic chart generated by Defendant (on or about February 2017) as part of its page's analytics entitled 'Pages to Watch'. It "(c)ompar(es) the performance of your Page and posts with similar Pages on Facebook." Even though Plaintiff was forced to stop boosting some 6 months earlier, the results are striking.

111.  The saying is 'do the math'. Plaintiff did so and the numbers are staggeringly clear and powerful for Plaintiff vis-à-vis the other comparables generated by Defendant. Defendant's Pages to Watch chart compared Plaintiff's results with those of Bed Bath & Beyond, Casper, Bath & Body Works Canada, and SHEEX. Based on Defendant's own metrics, Plaintiff's performance was staggeringly strong vis-à-vis these much larger entities only highlighting further how hateful and damaging Defendant's actions were.

112.  Throughout this unconscionable process, and validating

that Plaintiff was doing something effective and well-received by the public, Plaintiff's number of page Likes grew from under 600 to over 4,000. Many individual ads received over 5,000 Likes. Several ads received over 12,000 Likes.

113. Plaintif received lots of positive feedback from all kinds of people who were engaging with the ads. One person wrote: "Kangapoda, you are very welcome. Your company is highlighted with remarkable…photography, and points of knowledge which speaks very highly of your establishment."  Another wrote: "Ty kanga.  Keep posting the great ads!!!"  Another wrote: "That's the nicest ad I've seen in a long time, thanks! Will definitely check out the line when I next shop for! (sic)." Another wrote "Love KANGAPODA." Another wrote "Whenever I see a kangapoda advertisement my day is 100% bettet (sic)." This is merely a sampling. There were of course many many comments. These comments were hugely important to Plaintiff, as it was positive reinforcement from people it did not know in the face of horrible destructive actions by Defendant.

114. Finally, after years of hateful unconscionable tactics, Plaintiff determined to cry for help. On or about May 16, 2017, Plaintiff's President, Plaintiff Mr. Mintz, contacted Defendant Mr. Zuckerberg directly. He sent a lovely, professional letter where he laid out the damage and activities and besieged the end of this sabotage and nonsense. He begged and pleaded for them to cease and desist. All he wanted was to work with Facebook: "You

have terribly harmed a young entrepreneurial company with a product that has the grassroots' potential to take off that I only wanted to be a success on Facebook." Plaintiff also enclosed a pair of its fabulous washable slippers for Defendant Mr. Zuckerberg and his wife. Plaintiff also enclosed a draft of a tortious interference suit. Plaintiff begged Mr. Zuckerberg to intervene and cease their fraudulent activities.

115. Defendant Mr. Zuckerberg's lawyer called Plaintiff in response to his communication on or about the end of May 2017. The lawyer conducted himself pompously. He stated that Defendant was a private company. He used this as justification to assert that Defendant could do whatever it wanted. Plaintiff was amazed but not surprised at the callousness. Plaintiff however hoped that this was just lawyering, and Defendant Mr. Zuckerberg would speak with his people and Plaintiff would be able to conduct itself without the non-stop sabotage.

116. So how did Defendant respond after Plaintiff in good faith contacted Defentdant Mr. Zuckerberg to cry for help? Defendant burned everything to the ground! On information and belief, Defendant Mr. Zuckerberg ordered a Jack Nicholson Code Red.

117. On or about November 2017, to retaliate and punish Plaintiff for daring to reach out to Mr. Zuckerberg, Defendant Facebook destroyed several hundred of Plaintiff's scheduled

ads/posts. Every single ad that had been designed, uploaded to Facebook posts, and being worked on with captions and scheduling was corrupted. The message received was 'Error Desktop Preview Not Available'. What this means is the ads would not run; and Plaintiff could not even view or access them. Every single ad and there were hundreds of ads. This was grotesque. This was tantamount to digital arson.

118.  On or about November 14, 2017, Plaintiff emailed Defendant.  The Subject was '6 Months of Ads Are Being Burned'. "Are you going to allow 6 months of effort / 2 ads a day to be burned up?? Please don't do this / allow this to happen." Defendant responded with quasi-boilerplate.

119.  Plaintiff responded to Defendant's boilerplate even more strongly and substantively: "If I entered Facebook's premises and destroyed massive amounts of intellectual property . . . you would want me jailed. What you have done is the same.  This is such serious, glaring sabotage . . . that I will file a police report today. I may even call the FBI. I am and have been documenting everything. This will go to Mark Zuckerberg. As he is directly aware of the prior problems . . . he is either condoning this criminal act . . . or he will be appalled. I have at all times acted in good faith. I have at all times just wanted to have a fun and whimsical social media campaign. The damage caused has already been documented. So you come into my private intellectual property

bastion . . . and burn everything down! How dare you. I know this is Facebook . . . but people should go to jail!"

120. On or about April 27, 2018, an ad was actually allowed to be boosted. Plaintiff had essentially stopped all boosting activity, as Defendant would not allow it to function as has been pleaded with great specificity above. This boosted ad reached 5,823 people and had 153 Likes (2.58%). Defendant prompted Plaintiff to 'Boost Again'. "Your Ad Has a High Relevance Score. Great work! Your ad has an average relevance score of 9, which means it's getting more positive feedback and costing less to deliver than most ads on Facebook."

121. On or about May 2, 2018 (4 days later), Plaintiff decided to boost another ad. The boost was accepted. The ad was performing incredibly well. It was exciting and upbeat to be back in the game. It had been a long time since 2 ads were properly boosted. This ad was doing incredibly well. The ad had 4.9K Likes out of 22.3K People Reached (22%). Using Defendant Facebook's own benchmarks, if the ad discussed above in paragraph 120 had a High Relevance Score of 9 at 2.61% then this ad was off the charts! Plaintiff had hit a homerun! This ad was well on the way to 10,000 to 20,000 Likes. Perhaps, the ad goes viral.

122. Plaintiff went to add money to the running successful boost; and Defendant killed the ad. This is not cute and harmless. This is hateful sabotage. This was the knowing destruction of a

wildly — by Defendant's-own-metrics - successful ad. Moreover, Defendant also killed the Invite function on this ad so Plaintiff could not even invite the people who Liked this successful ad to Like the page.

123.   Subsequently, on or about May 2018, in a less obvious but equally malicious manner, Defendant burned the house down again, a second time. Defendant again sabotaged the entire Schedule Function.  This time, all of the ads that had been designed and uploaded to the Schedule function appeared to Plaintiff as if they were running when in fact they were sabotaged and would be seen by noone.

124.   Defendant had furtively manipulated the Schedule function so these ads would never appear in Plaintiff's Followers' newsfeeds. Said differently, Defendant perpetrated a second form of digital arson whereby the massive queue of scheduled ads would not be disseminated (and virtually invisible) unless a Follower directly logged into Plaintiff's Facebook page (which as Defendant knows so well, almost no one does). Persons engage with the posts that appear in their newsfeeds. If nothing appears in their newsfeed, they simply assume there was no activity. This sabotage technique was so sneaky that Plaintiff did not discover how sick and devious it was for quite some time.

125.   It is impossible with Plaintiff's 4,400 Followers for an ad / post to only reach 1 person or zero persons and have zero

likes – day after day and month after month let alone for years. Prima facie sabotage. When you do the math, Defendant exponentially destroyed years and a small city of Likes with this second sabotage/digital arson technique.

126.   Let us examine how impactful it is when Defendant queers a scheduled post so that it was seen by noone. To show how devastating, exponential, and cumulative the effects of Defendant's sabotage sneak attack was, Plaintiff re-posted from scratch several (of the many hundreds) of the identical ads that had been sabotaged in the Schedule Post function (for comparison for purposes of litigation).

127.   On or about November 2017, Plaintiff had an ad run from the sabotaged Scheduled ads – and it was seen by no one. "'The Plain Flat Top Sheet's Cycle Is Coming To An End' Granted it's been a 400-year cycle . . . but technology has changed everything . . . including the role of the bed. We do more things from bed including watching TV and surfing the web than could have ever been contemplated. And the most comfortable viewing position is on your back. But this forces the toes against a tight plain flat top sheet. The plain flat top sheet cycle is coming to an end because room for the feet under the covers makes a massive difference . . . Kangapoda is like an elegantly designed snuggie for your feet. #ObsoleteisObsolete#ThePlainFlatTopSheetHurts www.Kangapoda.com". No one saw this ad, as it was sabotaged by Defendant as part of

its destruction of all Scheduled ads.

128. On or about July 27, 2019, Plaintiff re-posted the identical ad including the identical caption and the identical description – the identical ad. It was NOT boosted, as the identical ad that ran from Scheduled ads had not been boosted. The difference is compelling and damning. Organically, 'The Plain Flat Top Sheet's Cycle Is Coming To An End' reached 863 (People Reached). There were 340 Engagements (340 out of 863). An impressive 39.4% of People Reached Engaged. That is spectacular. And, there were 274 Likes. That is correct. 31.75% of those reached LIKED the Ad.  That performance is spectacular too!!

129. Let us do the math.  Plaintiff used to run 2 ads a day 5AM / 5PM x 863 Reached x 365 days/year x 3 years = 1,889,970 people that could have / should have been reached. That is a small city of People Reached that Defendant flushed down the toilet.

130. Moreover, Plaintiff could have boosted this well-performing ad, had Defendant not killed the ability to boost. If allowed to be boosted, this representative ad could reached 100,000+ People and Garner 20,000+ Likes. This invigorates the Fan base offers energy excitement and growth.

131. Extrapolating, if Plaintiff were able to properly boost this ad and invite (as Defendant sabotaged this function too) those who Liked the ad to Like the page and this happened only 20 times a year for 3 years: the result would be 100,000 Reached x 20

times/year x 3 years = 6,000,000 People Reached. NOW YOU ARE TALKING!! This is the leverage of social media. This is what Defendant knowingly killed. This is what Plaintiff is capable of, was on the way to achieving, and was striving for. And Plaintiff's commensurate Page Likes and Followers could have been / should have been at 50,000+ as of this complaint. That is small Influencer level!

132. On or about February 9, 2019, as another test, Plaintiff boosted 'Tonight Under The Kangapoda' a close up essentially of the noses of 2 people almost touching (almost like an Eskimo kiss but the noses are not even touching) where you cannot see the foreheads of either model and only half the mouth of the male model. Defendant boosted and then unboosted this ad. This was another disgraceful action by Defendant. This was not even a kiss. Plaintiff has on file a Walt Disney kiss between the animated characters Rapunzel and Flynn Rider in the Disney kid's musical Tangled targeting children ages 5-8 and up. It is remarkably similar to Plaintiff's ad. A real kiss is fine for small children (as it should be), but a non-touching Eskimo nose kiss is unacceptable for adults ages 25-65. Nonsense. Subterfuge. Sabotage.

133. On or about May 5, 2020, Plaintiff discovered that Defendant had the gall to tamper with the already sabotaged ads left in the Scheduled Ads queue. Plaintiff had been preserving

them for the purposes of litigation. Bogus dates had been inserted. They were also locked so Plaintiff could not make any adjustments to them.  Plaintiff could do nothing with them.  Another sneaky action by Defendant.

134.  On or about August 14, 2020 at 5PM, all of these already tainted remaining ads queued in Scheduled Ads ran simultaneously. As they were sabotaged, they reached and were seen by 0 (ZERO) Followers.

135.  There is a reason that there is a Schedule Function in the first place. It is a productivity tool. It is an organization tool. It offers the ability to do things in batch mode. It offers the ability to take care of Easter or Christmas or National Plaid Day and cross it off the to do list and not have to worry about those days. Defendant made it impoostible to use the Schedule function ever again destroying Plaintiff's scheduling leverage. Plaintiff has not been able to utilize the Scheduling function for years.

136.  Defendant sabotaged the platform further by preventing ads from being properly disseminated.  Whereas the prior organic norm was reaching close to 1,000, Defendant fraudulently slowed that reach to a trickle. On or about September 8, 2017 a post 'Long Legs…K-A-N-G-A-P-O-D-A' organically reached 3,187 (People Reached). On or about November 5, 2018, an ad that was not boosted and not sabotaged organically reached 980 (People Reached), had

363 Engagements (37%), and 245 Likes (25%). Compare this to Autumn 2020, rarely does a post organically reach more than 300 people now.

137. Plaintiff is entitled to reach its 4,400 Followers. Defendant trumpets increasing the size of your base and inviting people to Like and Follow the page. That is why persons Liked the page in the first place – to receive Plaintiff's posts. If Kim Kardashian's followers did not receive a post, both she and her followers would be apoplectic and there would rightfully be a hue and a cry of fraud.  This is another form of sabotage and tortious interference.

138. On or about October 13, 2018, Plaintiff ran another test of Defendant's boost mechanism to see whether the hateful, unconscionable conduct would continue. Plaintiff requested a boost of a lovely two-tone Kangaplush blanket, and it was accepted. Plaintiff was prompted to up its boost. Defendant's proposition was to 'Add $53 USD and 5 more days and Reach 2,265 – 12,890 people per day'.  Aside from the fact that the promoted range is absurdly broad (e.g., this range differs by 82%) as to be False Advertising in and of itself . . . Plaintiff determined to test Defendant's offer and compliance.  It accepted the additional boost for $53.

139. On or about October 20, 2019, when the extra boost's 5 additional days ended, the result was demonstrable fraud and sabotage. Rather than reaching 5 x 2,265/day or 11,325 at the low

end; or 5 x 12,890/day or 64,450 at the high-end per Defendant's contract, the Total People Reached was a disgraceful, in-your-face 1,637 (including the original boost Plaintiff already had going). TOTAL!!

140.  To make this clear, the boost never – in total - reached the lowest promised level for a single given day, let alone for 5 days. This is a mockery. This is blatant fraud. Plaintiff's test proved that Defendant did not care. It would do whatever it wanted overtly and with impunity. Future boosting – use of this vital functionality – was completely off the table.

141.  On or about October 13, 2020, Defendant refused to boost a gorgeous purple and gold Kangaplush blanket ensemble to adults ages 25-65 in and around Los Angeles. "Lakers NBA Champs Again! Congratulations to the Los Angeles Lakers. What a year! From Anthony Davis' arrival to Magic Johnson momentarily losing his mind to Kobe Bryant's and the other families' tragic deaths to an early dose of Free Hong Kong to being blocked in and curtailed by COVID only to be resurrected in a magical disciplined bubble only to be roiled by dramatically important civil issues at all times with the backdrop of the need to re-unite our country and stop this divisive hatred. Wow! And, how can we not specifically mention LeBron James. Utterly fantastic. The engine that pulled and pushed and kept everything on the tracks. And, he did it while remembering to blow that locomotive horn for social justice and to VOTE! Put

this    magnificent    Kangaplush    ensemble    on    your    bed
https://kangapoda.com/.../gold-purple-la-pride-king-cal...    Use
code  GoLakersFeet  for  20%  Off  your  entire  order." Hateful.
Unconscionable. Unrelenting.

142.  Defendant  destroyed  years  of  effort  and  momentum  for
Plaintiff.  Plaintiff  has  proof  positive  that  Defendant  took
systematic  unconscionable  felonious  actions  and  non-stop
manipulated  its  platform  to  tortiously  interfere  for  the  purpose
of  destroying  Plaintiff's  social  media  efforts  in  retaliation  for
daring  to  challenge  Defendant's  absolute  power.

143.  Moreover,  the  Court  must  pay  judicial  cognizance  to
Defendant's  history  of  untoward  tactics  and  treachery.   You  lie
about  a  nickle  you  lie  about  a  dime.

144.  Defendant  Mr.  Zuckerberg's  life  is  littered  with
deception,  lies,  and  knowing  harm  to  others  including  partners. We
have  extensively  researched  his  history  from  infiltrating
protected  web  sites  and  stealing  pictures  and  other  information
for  FaceMash  when  a  student,  to  how  he  stole  the  initial  Facebook
concept  from  the  Winklevoss  twins  at  Harvard,  to  how  he  connived
to  steal  user  passwords  so  he  could  monitor  their  emails,  up  and
through  Defendant  being  fined  $5  billion  by  the  FTC  on  or  about
July  2019  for  violating  consumers'  privacy  rights  and  lying  to
Congress  about  it.  Defendant  Mr.  Zuckerberg  is  a  documented  bad
hombre.

145.   The   Court   must   pay   cognizance   to   the   strong   and accusatory commentary of Robert McNamee, a Silicon Valley venture capitalist and early Facebook investor and mentor, who wrote a detailed assault on Defendant and the people who built it. McNamee describes how parts of Defendant Mr. Zuckerberg's character — specifically his lack of empathy and world-class hubris — might eventually   get   baked   into   every   facet   of   Facebook, and Silicon Valley, from culture to code. The result, he says, are a host of social ills including technology addiction, assaults on democracy by its adversaries, and a rending of the social fabric across the globe. See Roger McNamee Zucked: Waking Up to the Facebook Catastrophe, Penguin Random House (2019).

146.   The Court must pay cognizance to Defendant's history of retaliation   including   digging   up   dirt   to   target   and   harm individuals who have dared to challenge it. See Carla Herreria, Facebook Admits to Targeting Billionaire Soros In PR Attack, Huffington Post, (November 21, 2018).

147.   The Court must pay cognizance to Defendant's documented history of wielding control over data to hobble rivals. Aaron Holmes, Leaked Emails: Facebook Wielded Control Over User Data to Hobble Rivals, Business Insider, (November 6, 2019)

148.   The   Court   must   pay   cognizance   to   how   Defendant   Mr. Zuckerberg has come under great reproach from the world and even from his own staff for knowingly aiding and abetting Donald Trump

by allowing foreign intervention in the election process as well as his dissemination of known falsehoods and hateful, divisive content surreptitiously on the platform. "(T)his can't possibly be the outcome you and I want, to have crazy lies pumped into the water supply that corrupt the most important decisions we make together. Lies that have a very real and incredibly dangerous effect on our elections and our lives and our children's lives." Aaron Sorkin, Opinion: Aaron Sorkin's Open Letter to Mark Zuckerberg, The New York Times, October 31, 2019, at O1.

149.  The Court must pay cognizance to Vanity Fair writer Sonia Saraiya's comments in her recent expose article. "According to McNeil (Joanne McNeil author of 2020 book Lurking) Zuckerberg never abandoned the view of his own users as 'dumb f**ks.' At its worst, she writes, 'Facebook is fully parasitic of everything human, while also, with its preset filters and artificial groupings, bulldozing the agency of users as individuals.' With humor, she adds that she tries to maintain some critical distance when writing about tech platforms — but Facebook's banal terribleness outmatches her capacity for objectivity. 'I hate it. The company is one of the biggest mistakes in modern history, a digital cesspool that, while calamitous when it fails, is at its most dangerous when it works as intended. Facebook is an ant farm of humanity.'" Sonia Saraiya, Excerpts from The Social Network Got Facebook and Zuckerberg All Wrong, Vanity Fair (October 6, 2020)

[https://www.vanityfair.com/hollywood/2020/10/the-social-network-got-facebook-and-zuckerberg-all-wrong]

150.  This action is about corporate sabotage and intricate harassment designed to kill Plaintiff's social media efforts and morale as punishment for daring to stand up for itself and question Defendant's total authority. Defendant knowingly hindered Kangapoda and prevented it from getting its message out. Defendant intentionally destroyed Plaintifff's traction, momentum, and social media campaigns.  Defendant destroyed Plaintiff's staff's joy and purpose. Defendant destroyed years of a patent protected advantage.  Defendant forced and compelled the reallocation of enormous time, money, and focus to respond and fight back.

151.  Tortious Interference and fraud are well-established torts; they are not novel causes of action. Society already considers retaliation and sabotage egregious; these hateful actions are serious antisocial behaviors that justify the imposition of substantial compensatory damages, punitive damages, and even criminal penalties.

152.  As a direct and proximate result of Defendants' tortious interference and the facts herein allege, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial.

<u>SECOND CLAIM FOR RELIEF</u>

(Conspiracy)

153. Plaintiff hereby re-alleges and incorporates by reference each-and-every allegation set forth at paragraphs 1 through 152, above, as though fully set forth herein.

154. A claim for civil conspiracy requires proof of "`a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" Banco Popular, N.A. v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993), certif. denied, 135 N.J. 468 (1994)).

155. "A plaintiff seeking redress need not prove that each participant in a conspiracy knew the 'exact limits of the illegal plan or the identity of all participants.'" [Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979), rev'd on other grounds, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed.2d 670 (1980)] (quoting Hoffman-LaRoche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir. 1971)). The unlawful agreement need not be express. The participants in the conspiracy "must share the general conspiratorial objective, but. . . need not know all the details of the plan designed to achieve the objective or possess the same

motives for desiring the intended conspiratorial result." Ibid. To establish a conspiracy, "it simply must be shown that there was `a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" Ibid. (quoting Hoffman-LaRoche, Inc., supra, 447 F.2d at 875). [Morgan, supra, 268 N.J. Super. at 364]. For liability, it is sufficient if the parties "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do their part to further them." Banco Popular, supra, 184 N.J. at 177. "Most importantly, the `gist of the claim is not the unlawful agreement, but the underlying wrong which, absent the conspiracy, would give a right of action.'" Id. at 177-78 (quoting Morgan, supra, 268 N.J. Super. at 364).

156. Plaintiff declares and the facts and actions bear out that Defendant, with different functionalities, departments, offices, time-zones, teams, etc. worked in concert to callously destroy Plaintiff's social media efforts in retaliation for Plaintiff repeatedly challenging Defendant's actions and total authority.

157. Defendant was unrelenting. Defendant took so many unconscionable and untoward granular actions that multiple parties had to work in concert.

158. Defendant coordinated its non-boost and un-boost sabotage policy against Plaintiff internationally and timewise.

Plaintiff tried to boost ads at different times, on different days, and at all different hours hoping to find a reprieve. As set out with particularity above, even when Plaintiff was successful at getting an ad to be boosted, Defendant would unconscionably (and illegally) stop it when it realized it had been approved and was successfully functioning.

159. On information and belief, Plaintiff realized that Defendant's various departments and offices were operating in cohoots – across time zones and departments – to harm Plaintiff's social media efforts. Defendant had 'signaled' that there was to be no boosting whatsoever. Defendant had put Plaintiff on its 'screw em' list.

160. As a direct and proximate result of Defendants' conspiracy and the facts herein alleged, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial.


<u>THIRD CLAIM FOR RELIEF</u>

(Intentional Infliction of Emotional Distress/Negligent
Infliction of Emotional Distress)

161. Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 160, above, as though fully set forth herein.

162. "Tort law protects people from harms which result from

the wrongful conduct of others. While we usually associate tort claims with harms to people or to property, the law also recognizes emotional or psychological harm as a distinct form of injury. This recognition was a result of a historical development, as society increasingly understood the severity and the long-lasting consequences of mental injury." Tort Law: Liability for Emotional Distress Torts, Law Shelf Educational Media, September 2020, https://lawshelf.com/shortvideoscontentview/emotional-distress-torts/.

163. Intentional infliction of emotional distress allows individuals to recover for severe emotional distress caused by a defendant who intentionally or recklessly inflicted emotional harm by behaving in an extreme and outrageous way. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46 (2012).

164. The tort of intentional infliction of emotional distress has four elements: (1) Defendant acted intentionally or recklessly; (2) Defendant's conduct was extreme and outrageous; and (3) Defendant's conduct is the cause of (4) severe emotional distress. A classic formulation of the standard is the conduct would cause a reasonable person to feel extremely offended, shocked, and / or outraged. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46 (2012).

165. In order to state a cause of action for intentional infliction of emotional distress, "plaintiff must establish

intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988). "The conduct must be `so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Ibid.

166. Whether an actor's conduct is `extreme and outrageous' depends on the facts of each case, including the relationship of the parties, whether the actor abused a position of authority (e.g., power, duty, etc.) over the other person, whether the other person was especially vulnerable and the actor knew of the vulnerability (e.g., Plaintiff's many direct communications to Defendant made it very clear), the motivation of the actor (e.g. Defendant's retaliation and punishment will be proved by a preponderance), and whether the conduct was repeated or prolonged (e.g., this was a pattern and practice of destructive conduct, not an isolated incident, over years). Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46 (2012).

167. Intentional infliction of emotional distress protects against "conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." William L. Prosser, Law of Torts 56 (4th ed. 1971). Wilful injuria is in

law malicious. Wilkinson v Downton [1897] 2 QB 57.

168.  The 'beyond a reasonable doubt' standard of proof in a criminal case is a far higher bar than the 'preponderance of evidence' standard of proof in this civil action. Preponderance of evidenced means that it is more likely than not that the facts are that which one of the parties claims.  Said differently, at least 51% of the evidence shown must favor the plaintiff's story and outcome. Because of this, if someone is convicted of a crime, he or she is automatically liable in civil tort law under the 'negligence per se' doctrine. In like manner, behavior that breaks criminal law should automatically meet the "extreme and outrageous" standard.

169.  Courts uniformly hold that reckless conduct, not just intentional conduct, can support a claim for intentional infliction of emotional harm. An actor intends severe emotional harm when the actor acts with the purpose of causing severe emotional harm or acts knowing that severe emotional harm is substantially certain to result. An actor acts recklessly when the actor knows of the risk of severe emotional harm (or knows facts that make the risk obvious) and fails to take a precaution that would eliminate or reduce the risk even though the burden is slight relative to the magnitude of the risk, thereby demonstrating the actor's indifference. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46.

170.   Destroying something that is loved by someone is never cute and cuddly. It is most always ugly, mean-spirited, and an assertion of dominance. No one knows better than Defendant the depth of the relationship between the entrepreneur and the company that grew from his or her aha moment. No one knows better than defendant the role entrepreneurs play as well as the entrepreneur's commitment and investment in terms of finances, years, blood, sweat, and tears.

171.   This is not a toy.  This is Plaintiff's life. Just ask any entrepreneur. This case involoves an entrepreneur risking everything. Few understand entrepreneurship and the importance today of social media success and traction more comprehensively than does Defendant.

172.   In this case, discussing the existence of a pattern or practice is almost a joke. Defendant's assault was daily over years – continuing to the present. Plaintiff has a clear, chronicled, documented, massive file of Defendant's deceit and destruction day after day for years for no reason other than to intimidate, harm, and destroy in retaliation.

173.   Defendant's actions smack of the schoolyard or workplace bully. Bullying can cause lasting emotional damage to the victim. Bullying is just a horrible thing. One essential prerequisite is the taking advantage of an imbalance in physical or social power. This imbalance distinguishes bullying from conflict – bullying is

not a fair fight.

174.  Bullying is the activity of repeated, aggressive behavior intended to hurt another individual, physically, mentally, or emotionally. Physical bullying includes damaging a victim's property or possessions. Damaging property and possessions may be different in the digital age – but it is still injury.  Instead of coming home from school with torn clothing, damaged books, or other injury to other possessions, Plaintiff's intellectual property was digitally harmed, injured, or destroyed daily.

175.  Bullying is characterized by the following three criteria: (1) hostile intent, (2) imbalance of power, and (3) repetition over a period of time. See Wikipedia, the Free Encyclopedia, Bullying, at https://en.wikipedia.org/wiki/Bullying (Last edited on 25 August 2020).

176.  As we have become an evolved society, "adult bullying is increasingly well understood and the scientific research outcomes are filtering through to influence strategies at both the levels of protection and intervention." Peter Randall, Bullying in Adulthood: Assessing the Bullies and their Victims, Taylor & Francis Inc. (2001).

177.  Post-traumatic stress disorder symptoms and social anxiety issues similar to those experienced by rape victims are often sustained by bullying victims.

178.  Being relentlessly attacked by a massive bully when you are dwarfed in size and resources is belittling and draining. It is traumatizing. It robs the victim of a peaceful existence. It scars you. It changes you forever.

179.  It is also frightening and tough to take on the bully. The psychological and emotional harm and depression deepens and pervades more and more areas of life over time. Further, being in a hateful, litigation posture day after day for years compels the reallocation of time and resources resulting in further opportunity losses.

180.  This non-stop battle is not anything Plaintiff ever imagined. In fact, the record clearly establishes Plaintiff's continuous desire and attempts to make things copacetic. "Please don't do this.  Please stop.  We just want to be successful on the platform.  We have no desire to have problems with Facebook." But those who have been bullied and picked on day after day sadly know that pleas only excite and embolden the bully. The victim would do most anything to escape it.

181.  Being an entrepreneur – and betting your life on a product or service idea – is a different proposition from going to a 9-5 job. It is a different propostion running up debt on your credit cards to fund things. It is a different proposition going without salary for years while working 14-hour days to subsidize the endeavor. The company is like a child.  So, it is devastating

to helplessly watch it being destroyed, the clock ticking on intellectual property patents that you have invested years and money in to obtain, the joi de vivre sucked out of the Company and the team.

182. Defendant's behavior was not only mean-spirited and tortious but also its conduct reflected a calculated plan to cause emotional harm to Plaintiff. All the acts attributed to Defendant, taken together, constitute such an outrageous pattern and practice as to be utterly intolerable in a civilized community.

183. Courts look at the severity of the distress including the intensity and duration. Severe or extreme levels of emotional distress must be long lasting and of a nature that no reasonable person is expected to endure.

184. Plaintiff's founder – the entrepreneur who has risked everything to make more people's feet more comfortable under the covers - has suffered and continues to suffer from: fatigue yet with an inability to sleep; digestion issues (that did not exist prior), skin issues (that did not exist prior); agitation; irritability; anger; confusion; sadness; distrust; anxiety; shorter attention span; angst; lack of social interests; lack of trust; damaged self-confidence; financial fears and distress; disappointment; and depression. Plaintiff has had to live with his hopes and dreams being decimated daily.

185. As a direct and proximate result of Defendant's conduct

and the facts herein alleged, Defendant intentionally (or negligently) inflicted emotional distress and Plaintiff has suffered severely as a result to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (Antitrust)

186. Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 185, above, as though fully set forth herein.

187. Under federal antitrust law, federal courts have exclusive "subject matter jurisdiction" over federal antitrust claims (28 U.S.C. §1337(a)).

188. Under federal antitrust law, persons and companies harmed by anticompetitive conduct may seek an award of triple their damages, an injunction, and costs of the action (including attorney fees) against a party that violates federal antitrust laws.

189. Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees. The phrase "injured in his business or property" is interpreted broadly by the courts. Accordingly, a plaintiff need only allege some economic loss for which recovery is sought.

190. The "person(s)" authorized to bring a suit under federal

antitrust laws include individuals, corporations, and partnerships.

191. All private antitrust plaintiffs must show an antitrust violation, an injury, and a causal connection between the two in order to recover damages against a defendant. The plaintiff must also show that the defendant's conduct was the material cause of the injury and therefore justifies an award of damages.

192. Private antitrust claimants need to demonstrate "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful" (Brunswick Corp. v. Pueblo Bowl-O-Mat Inc., 429 US 477, 489 (1977)). No simple test or formal criteria determines antitrust injury. Each case must be considered on its particular facts.

193. When the antitrust plaintiff seeks damages, the parties to a federal antitrust action are entitled to a jury trial under the Seventh Amendment to the US Constitution.

194. "As is true in every case involving the construction of a statute, our starting point must be the language employed by Congress. Section 4 of the Clayton Act, 38 Stat. 731, provides: 'Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a

reasonable attorney's fee.' 15 U.S.C. 15 (emphasis added). On its face, 4 contains little in the way of restrictive language. In Pfizer Inc. v. Government of India, 434 U.S. 308 (1978), we remarked: `The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices [442 U.S. 330, 338] by whomever they may be perpetrated.'" Mr. Chief Justice Burger, Reiter v. Sonotone Corp., 442 U.S. 330 (1979).

195.  Private plaintiffs play a central role in US competition law. Charles E. Koob & Peter E. Kazanoff, Simpson Thacher & Bartlett LLP, Private Anti-Trust Remedies Under US Law, Global Counsel Competition Law Handbook 2004/05 (Practical Law Company).

196.  "Congress, when it enacted Section 7 of the Sherman Act and subsequently Sections 4 and 16 of the Clayton Act, had a broader object in view than merely making provision for the alleviation of individual grievances resulting from violation of the antitrust laws. In fact, it was the legislative intent that the individual, by securing redress for himself would thereby supplement governmental enforcement in the antitrust field . . . The treble damage action was intended not merely to redress injury to an individual through the prohibited practices, but to aid in achieving the broad social object of the statute." Everette MacIntyre, Commissioner Federal Trade Commission, on The Role of the Private Litigant in Antitrust Enforcement, Before Joint Meeting of the Antitrust Sections of the Chicago Bar Association

and Illinois State Bar Association Antitrust Symposium on Private Antitrust Litigation (Chicago, IL 1962).

197. Congressional sentiment, as well, runs strongly in favor of the supplemental enforcement of the antitrust laws afforded by the private litigant. "You and I have recognized that we need a strong and effective antitrust policy . . . We have recognized that a necessary and integral part of any such policy is full and effective enforcement of our antimonopoly laws. For many years it has been recognized that the Government alone is not able to provide all of the necessary enforcement. The help of all citizens is needed. We know that private parties will help in this endeavor if we afford them rightful opportunities. In other words, we can expect this help if we give them the right to proceed and see to it that they are treated reasonably respecting recoveries of damages and costs of litigation." Rep. Wright Patman, Before the Antitrust Subcommittee of the Committee on the Judiciary, House of Representatives on H.R. 10243 (August 6, 1958).

198. A structural analysis of the social media market underscores Defendant's incredible power and its position as both a monopoly and a communications utility. Defendant is this era's new communications service affecting over 2.5 billion people across the world. When the social media market was emerging, there was early competition. However, this is no longer the case. Defendant's market entry to its position today of total domination

is a story of continuous, exponential, unregulated, anticompetitive conduct. Further, Defendant's pattern of false statements and misleading conduct induced consumers to trust and choose Defendant's platform. Today, Defendant Facebook so dominates, there is no other option. It is the only game in town.

199. What is so unscrupulous is that using Defendant Facebook means accepting a product linked to broad-scale commercial surveillance — a paradox in a democracy. It is a certainty that Defendant's extraction of huge amounts of personal data from consumers is this giant utility's form of monopoly rents. There ain't no such thing as a free lunch. See Srinivasan, Dina, The Antitrust Case Against Facebook, 16 Berkeley Bus. L.J. Issue 1, (September 10, 2018). Moreover, Defendant continues to assert its dominance and take more aggressive (and questionable) actions, not surprisingly, as its competition eroded. Id.

200. Defendant Facebook has also designed its platform to make it virtually impossible to move all the relationships and photos to an alternative platform. It is not replaceable. It has metastisized. Carrying this logic further, Facebook has become an entrenched social media utility (see David Kirkpatrick, The Facebook Effect: The Inside Story of the Company That Is Connecting the World, Simon & Scuster (2010)).

201. Defendant's position as the social media monopolist controlling the entire social media communications system and the

sole arbiter having to answer to no one with regard to what can and cannot be done is a dangerous make or break you power. See, e.g., McGahee v. N. Propane Gas Co., 858 F.2d 1487, 1505 (11th Cir. 1988) ("Determining whether a defendant possesses sufficient market power to be dangerously close to achieving a monopoly requires analysis and proof of the same character, but not the same quantum, as would be necessary to establish monopoly power for an actual monopolization claim.").

202.  "Power tends to corrupt, and absolute power corrupts absolutely" (Sir John Dalberg-Acton, 8th Baronet). "The greater the power, the more dangerous the abuse." (Edmond Burke).

203.  A monopolist conspiring to do harm to one reliant on it, by its very nature, is malicious. Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . ." Antitrust violations are serious crimes.

204.  Presently, Defendant - an unregulated monopolist of a vital communication medium - unilaterally determines, without oversight or accountability, which businesses get their messages out and which do not - nothing is evenhanded and kosher. Moreover, as set out in the pleadings above, Defendant can and will make features work or not at its whim and even destroy vasts amounts of

work product – also at its whim – for sport, in retaliation, for punishment, or otherwise.

205.  While individuals may not pay Defendant out-of-pocket, business users most certainly do. Defendant makes massive amounts of money from companies boosting their ads/posts to reach more people.  Boosting is anything but a free lunch.

206.  An all-powerful communications monopolist and utility cannot do whatever it wants whenever it wants. It cannot charge for boosts and decide whether to give the good boost or the bad boost. It cannot stop approved boosts when they are successful just because. It cannot cripple critical functionalities such as the invite function and the scheduling function in retaliation. It cannot destroy massive amounts of property for punishment and sport.

207.  Section 2(a) of the Robinson-Patman Act (a part of the Clayton Act) prohibits the charging of discriminatory prices for commodities "of like grade and quality." A boost can be likened to a commodity and Plaintiff is entitled to proper boosts of like grade and quality given to others. Sabotaging the system to overcharge or destroy the functionality of this vital social media commodity is not only tortious but also discriminatory.

208.  We are at a strange moment in time vis-à-vis the antitrust laws. Defendant has eliminated virtually all competition. This bizarre starting point is theoretically

everything the Sherman Act is supposed to cover and prevent. Accordingly, debating the merits of Chicago School economics (see generally Jonathan B. Baker, Recent Developments in Economics That Challenge Chicago School Views, 58 ANTITRUST L.J. 645 (1989 ) or the pros and cons of false positives (See, e.g., Sherman Act Section 2 Joint Hearing: Refusals to Deal Hr'g Tr. 23, July 18, 2006 (Pitofsky) ("[T]here have been mistakes that have been made, but the idea that there's just constant false positives, I don't know where that's coming from.")) are not only beyond the scope of this action but also irrelevant to it.

209. The antitrust laws are grounded in 2 things: consumer protection and competition. The Clayton Act lists a handful of historically anti-competive practices. Does the enumeration of these schemes imply that Congress intended the Clayton Act to apply only to those listed infractions or can a broader reading and interpretation be made? Posed differently, is there an underlying spirit to the Clayton Act such that expressio unius est exclusio alterius is not the intention.

210. It is inappropriate and antithetical to focus solely on the word 'competition' or harms to competition or sustaining competition when there is virtually no competition. At its core – in prima instantia pertractatis – antitrust laws are to maximize consumer welfare. The antitrust laws are to protect consumers from predatory business practices.

211.   Just because has always been an authoritarian fallacy; and just because Defendant, an all-powerful monopoly, was (allowed to be) successful at eliminating all competition does not mean the consumer can be neglected. The consumer and the people of the United States of America are what the antitrust laws are about. This action is far more fundamental. Unless the court is willing to rubber stamp 'there is no longer competition, therefore anything goes', then it is vital to examine the underlying legislative intent.

212.   Certainly, Congress has seen fit to encourage expanded interpretations of The Clayton Act with Section 5 of the Federal Trade Commission Act. Section 5(a) of the Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce." (15 USC §45). Section 5's ban encompasses not only those acts and practices that violate the Sherman or Clayton Act but also those that contravene the spirit of the antitrust laws and those that, if allowed to mature or complete, could violate the Sherman or Clayton Act.

213.   "[T]he ultimate concerns of Congress were not business and competitive conditions per se. Rather, the concern was for harm to consumers and members of the general public. Ordinarily we seek to indirectly safeguard the welfare of this group by ensuring that competition is fair and vigorous. In some respects, however, it may be preferable to address this goal directly." Neil W.

Averitt, The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act, 21 Boston College Law Review.  Issue 2 Number 2, Article 1 (1980)

214.  "There is a presumption that the specific terms of the Clayton Act do not exhaust the legislative intent, and a(n) . . . action may . . . be brought to halt . . . conduct that is not expressly barred by the Act . . . The task of justifying this rule of construction . . . begin(s) with the legislative history of the Clayton Act . . ."  Ibid.

215.  "The unfairness must be tinctured with unfairness to the public; not merely with unfairness to the rival or competitor ... We are not simply trying to protect one man against another; we are trying to protect the people of the United States, and of course, there must be in the imposture or in the vicious practice or method something that has a tendency to affect the people of the country or be injurious to their welfare." 51 CoNG. REc. 12150-12151 (remarks of Senator Cummins) (1914)

216.  The Supreme Court has always looked to right and wrong, and 'good morals' as guiding principles. Accordingly, practices "characterized by deception, bad faith, fraud or oppression, or as against public policy" have been cited as violative. F.T.C. v. Gratz, et al., 253 U.S. 483 (1920)

217.  The Supreme Court has also stated that "the Commission, 'like a court of equity,' could consider "public values beyond

simply those enshrined in the letter . . . of the antitrust laws." Federal Trade Commission v. Sperry & Hutchinson Trading Stamp Co., 405 U.S. 233 (1972).

218.   In practice, stand alone Section 5 violations – versus more direct violations of the Sherman or Claton Acts – are more limited. For this action, Section 5 presents more of a guideline and reflection of the spirit of the antitrust laws and a way to examine how the antitrust laws theoretically ecompass Sherman Act violations, Clayton Act violations, oversight violations brought by the FTC under Section 5 with private plaintiffs holding the whole thing together.

219.   Significantly, the FTC has received widespread criticism for incompetence for almost a century. Judge Richard Posner, who was a former staff attorney of the FTC and a member of the ABA Commission investigating the FTC, stated: "What is remarkable about these studies, which span a period of 45 years, is the sameness of their conclusions . . . The FTC was generally rudderless; poorly managed and poorly staffed; obsessed with trivia; politicized; all in all, inefficient and incompetent. And the persistence of these criticisms would seem to indicate largely impervious to criticism." Posner, The Federal Trade Commission, 37 U. Chi. L. Rev. 47 (1969) [Judge Posner references these critical works Gerard Henderson, The Federal Trade Commission: A Study in Administrative Law and Procedure, New Haven: Yale University Press

(1924); Report of the ABA Commission to Study the Federal Trade Commission (aka The ABA Report) (1969); Commission on Organization of the Executive Branch of the Government, Task Force on Regulatory Commissions (aka The Hoover Commission Report) (1949); E. Cox, R. Fellmeth & J. Schulz, The Consumer and the Federal Trade Commission (aka The Nader Report on the Federal Trade Commission) (1970); Auerbach, The Federal Trade Commission: Internal Organization and Procedure, 48 Minn. L. Rev. 383 (1964); and Elman, A Modest Proposal for Radical Reform, 56 A.B.A.J. 1045 (1970)].

220. Moreover, much of the FTC's activity benefits corporations, trade associations or unions. The ABA Commission stated: "Often the [FTC] has seemed more concerned with protecting competitors of an enterprise practicing deception rather than consumers." Allan Bruce Currie, A Private Right of Action Under Section Five of the Federal Trade Commission Act, 22 Hastings L. J. Issue 5 (1971) citing The ABA Report.

221. "The protection offered by the FTCA, although described in the 'interest of the public,' [15 U.S.C. § 45(b) (1964)] in fact provides no meaningful consumer protection. A denial of a private right of action leaves the protection afforded by the FTCA largely illusory. The paradoxical result is that the FTCA can protect the public only if private parties can bring actions under section 5." Id.

222. Although the FTCA does not specifically define a private

right of action, There is plenty of analogous precedent to look to regarding federal courts finding a private cause of action in federal statutes which neither confer nor deny the right to bring a private action. These rights have been judicially interpreted and granted to parties who allege that a defendant's conduct has caused injury and the injured party is of a class which the statute was intended to protect.

223.   "In the context of a plaintiff seeking to invoke a remedy afforded by section 10(b) of the Exchange Act and Rule 10b-5, '[t]he first question is whether the plaintiff alleges that the challenged [conduct] has caused him injury in fact, economic or otherwise . . .' The second question is whether 'the interest sought to be protected by the complaint is arguably within the zone of interests to be protected' by section 10(b) and Rule 10b-5." Herpic v. Wallace 430 F.2d 792 (5th Cir. 1070) citing Data Processing Svc. Orgs. v. Camp, 397 U.S. 150 (1970). See also Wyandotte Trans. Co. v. United States, 389 U.S. 191 (1967).

224.   In Goldstein v. Groesbeck, the Court of Appeals granted private relief under the Public Utility Holding Company Act of 1935: "[W]e think a denial of a private right of action to those for whose ultimate protection the legislation is intended leaves legislation highly publicized as in the public interest in fact sadly wanting, and even delusive, to that end." Goldstein v. Groesbeck, 142 F.2d 422 (1944).

225.    The Harvard Journal of Legislation recommended a private right of action under a statute modeled after section 5 of the FTCA, arguing it was both more economical and more effective to encourage the consumer to seek private redress: "[A]llowing the aggrieved consumer to take legal action to obtain convenient and speedy redress . . . avoids . . . creating a 'bottleneck' where only a limited number of consumers will get the protection they deserve or (2) forcing the expenditure of tax dollars for a larger attorney general's office to do much that the consumer, if given the opportunity, could do himself." An Act To Prohibit Unfair and Deceptive Trade Practices, 7 Harv. J. Legis. 122, 147 (1969).

226.    The Honorable Gus J. Solomon, Senior United States District Judge – in a powerful, thoughtful, thorough, learned (and scathing) must-read dissent – stated: "Section 5 of the Trade Act is intended to protect the public from 'unfair or deceptive acts or practices in commerce.' The Trade Act expressly grants authority to the Federal Trade Commission (the FTC) to enforce Section 5, but it does not mention private actions by aggrieved consumers. The FTC has been ineffective in its role as a consumer protection agency . . . I do not believe the protection of Section 5 can be a reality without private actions . . . The majority assert that Section 5 does not provide the consumer with either an explicit or implicit direct remedy and that '[t]his conclusion is supported by solid authority of long standing.' I disagree. Claimants, as

consumers, . . . are aggrieved parties and are entitled to the benefits and protection of the Trade Act. Nothing in that Act gives the FTC either primary or exclusive jurisdiction. Most of the authorities upon which the majority rely are either admittedly dicta or are unfair competition cases . . . Only three weeks after enacting the original Section 5, Congress explicitly created a private right of action to redress many of the kinds of unfair competition prohibited by Section 5. See 15 U.S.C. § 15 (Section 4 of the Clayton Act) . . . Crime is crime whether it be at the tip of a gun or the tip of a pen . . . I believe that Section 5 allows private actions. Appellants' claims are based on the established principle that a party has a cause of action when damaged by conduct that violates a statute enacted for his protection. Restatement of Torts, 2d § 286. I find no reason to deviate from that principle here." Carlson v. Coca-Cola Company, 483 F.2d 279, 281 (9th Cir. 1973) (SOLOMON, Senior District Judge dissenting).

227. Judge Solomon concluded with the maxim, Ubi jus ibi remedium. Texas Pacific Ry. v. Rigsby, supra, 241 U.S. at 39, 40, 36 S.Ct. at 483." Id. Where there is a right, there is a remedy. This is Law and Jusice 101.

228. Citing Latin phrases is helpful (in addition to being very cool) as Latin was the medium of communication used by rulers and intellectuals of early civilization. Latin essentially

codifies – almost like poetry - critical methodical teachings and learnings. Latin represents our connection to the history of man.

229. In Stoneridge Investment Partners, Justice Stevens offered a compelling endorsement of courts redressing wrongs: "During the first two centuries of this Nation's history much of our law was developed by judges in the common-law tradition. A basic principle animating our jurisprudence was enshrined in state constitution provisions guaranteeing, in substance, that 'every wrong shall have a remedy.' Fashioning appropriate remedies for the violation of rules of law designed to protect a class of citizens was the routine business of judges. See Marbury v. Madison, 1 Cranch 137, 166 (1803). While it is true that in the early days state law was the source of most of those rules, throughout our history — until 1975 — the same practice prevailed in federal courts with regard to federal statutes that left questions of remedy open for judges to answer. In Texas & Pacific R. Co. v. Rigsby, 241 U. S. 33, 39 (1916), this Court stated the following: 'A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law expressed in 1 Com. Dig., tit. Action upon Statute (F), in these words: 'So, in every case, where a statute enacts, or prohibits a thing for the benefit

of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law.' (Per Holt, C. J., Anon., 6 Mod. 26, 27.)'" Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc. 552 US 148 (2008) (Stevens, J., dissenting).

230. Phillip Elman, an FTC Commissioner for two terms, maintains that "[w]hen only private interests are aggrieved, the proper remedy is private action in the courts. A tort, whether the victim is a competitor or a consumer, is a private, not a public wrong – and the place to seek relief is in a court, not a regulatory agency ... Just as the administrative process should not be used to insulate businessmen from the rigors of a free enterprise economy, it should not be used to relieve the courts of their duty to redress violations of private rights.  Elman, A Modest Proposal for Radical Reform, 56 A.B.A.J. 1045 (1970)

231. Elise Walter, an SEC Commissioner, fiercely advocated for private rights stating: "Let me start with what I believe should be a non-controversial first principle: A statute is merely a suggestion, rather than a mandate, if it cannot be enforced." Commissioner Elisse B. Walter, U.S. Securities and Exchange Commission (SEC), Remarks Before the FINRA Institute at Wharton Certified Regulatory and Compliance Professional (CRCP) Program University of Pennsylvania (with Commissioner Walter taking a strong and unequivocable stand in favor of the private right of

enforcement) November 8, 2011.

232.   The Who famously cried out Tommy Can You Hear Me?  What is going on here? What kind of callous abrogation of duty is being allowed to be perpetrated when even the Commissioners are crying out for private actions and harm is being wantonly caused by the most powerful?  We can look to the field of medicine – similar to the courts, in that medicine is about redressing and preventing injuries and disease - for a helpful Latin analogy: ubi pus, ibi evacua. Where there is pus, evacuate it.

233.   The aggressive statement 'in-your-face' comes from the playground basketball hardcourts when you defiantly hit a jump shot despite the defense. In law, when it is in-your-face, it is called prima facie.

234.   You do not need to be terribly clever to understand Defendant's actions are prima facie monopoly abuse and prima facie antitrust injury. This is Defendant's perverse proposition: We will charge you whatever we want (whenever we want); and deliver whatever we care to deliver (or not); and, if we so choose, we will just short-circuit everything (at our whim). And, if you dare cry foul, we will destroy you. This may be Defendant Mr. Zuckerberg's documented modus operandi, but it is not good law – it is tortious and illegal. Moreover, it is everything the monopoly laws are designed to oppose.

235.   If  a  massive  supermarket  chain  weighed  the  beef

differently for different customers or rigged the scales, they would be punished.

236.   If the electrical company cut your electricity or created power surges to damage your property to punish you for challenging its practices, they would be liable.

237.   If the water company cut off your water or gave you improperly filtered water because you challenged its practices, they would be liable.

238.   If Microsoft triggered bugs/trapdoors in its Windows operating system or in its Office program to destroy your data because you challenged its practices, they would be liable. Even having implanted these bugs/trapdoors is likely an actionable crime.

239.   We do not need to get to whether a private cause of action under Section 5 is applicable as much as to understand that Section 5 reveals that the Clayton Act is broad and does indeed encompass injury to the consumer. We also do not have to get to whether the FTC is overburdened, lame, corrupt, all of the above, or some of the above. Rather, we can conclude that holding our breath for the FTC is error based on years of critical evaluation by experts.

240.   A private cause of action under the Clayton Act is fine and private plaintiffs are directly statutorally encouraged. Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any

person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

241. This court needs to behave learnedly and justly – you have subject matter jurisdiction - and this action is prima facie a forbidden antitrust violation. Private plaintiffs are part of the antitrust fabric – they are vital attorneys general.

242. It is untenable to have blatant, amoral, criminal, in-your-face, sabotage by the largest monopoly perhaps ever in the history of the world well-documented, spanning years, and have to worry that in the United States of America, our courts will go out of their way not to protect the victimized party.

243. Since Defendant's monopoly is already in place, the emphasis must be on protection of the consumer versus on conspiratorial plans of attack used in the past to achieve the monopoly. Moreover, vis-à-vis this overt in-your-face sabotage, worrying about conspiracies to raise hearing aid prices seems rather cute and trivial [see Reiter v. Sonotone Corp. supra]. Defendant's actions are a clear and present danger to the consumer.

244. Defendant Facebook, the social media monolith and monopoly, destroyed Plaintiff's ability to use this vital communication utility, rigged the platform to not operate properly, charged for services it did not deliver fairly or

properly, and destroyed Plaintiff's work product and intellectual property, among a laundry list of daily unconscionable actions spanning years (and still continuing) because Plaintiff challenged Defendant's practices and assertion of total authority. Defendant must be liable for its outrageous conduct and the full panoply of damages it caused.

245.   Defendant Zuckerberg knew. He was completely aware and informed by Plaintiff. Defendant Zuckerberg participated in, acquiesced to, and/or ratified this morass of unlawful actions. He oversaw the escalation of sabotage. "(W)hat those who live in Facebook's world know is that regardless of what (Defendant) Zuckerberg understands, he just doesn't care. This is a man whose motto once was 'companies over countries'." Sonia Saraiya, supra paragraph 148. Accordingly, Defendant Mr. Zuckerberg is personally liable both as an officer of Defendant and as its emperor in chief with complete knowledge, dominion, and control.

246.   A private plaintiff can also seek an injunction "against threatened loss or damage by a violation of the anti-trust laws" under Section 16 of the Clayton Act, 15 U.S.C.S. § 26. Unlike section 4 (cited in paragraph 194), actual injury is not required under section 16; the threat of injury is sufficient. To obtain a preliminary injunction, a plaintiff typically must show: (i) a likelihood of success on the merits; (ii) a threat of irreparable harm with no adequate remedy at law; (iii) a threatened injury

that outweighs the harm that the injunction may create for the defendant; and (iv) the granting of the injunction is in the public interest. Injunction is discussed more under EIGHTH CLAIM FOR RELIEF (Declaratory and Injunctive Relief) below.

247.  Defendant, a social media communications monopolist and utility, knowingly engaged in myriad business torts, with the intention of destroying Plaintiff. Defendant, not surprisingly, was successful in inflicting the harm it intended. Plaintiff has pleaded with great specificity (and sadly merely a fraction of) the endless unconscionable acts Defendant took as part of a pattern and practice to cause hateful damage to Plaintiff. As a direct and proximate result of Defendants systematically abusing it monopoly position and the facts herein alleged, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial.

### FIFTH CLAIM FOR RELIEF

(Punitive Damages)


248.  Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 247, above, as though fully set forth herein.

249.  Defendant's actions were evil-minded, egregious, and evidenced wanton disregard toward Plaintiff, and Defendant acted

with oppression, fraud, and malice.

250. Plaintiff has demonstrated that Defendant, a relied upon social media utility, abused its power and position as a monopolist, colluded and conspired, and through treachery and manipulation of a system they control without oversight, sabotaged Plaintiff's social media campaign. In doing so, they tore apart this entrepreneurial company.

251. This is particularly reprehensible given Defendant's power and position and conceptually the beacon for openness, free speech, and commerce. This is far beyond even the contemplation of BMW of N. Am., Inc. v. Gore, 517 US 559 (Supreme Court 1996) 576, 827 that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty".

252. Punitive damages are designed to require wrongdoers to pay an amount of money that is sufficient to punish the Defendant for egregious conduct and to deter Defendant from misconduct in the future. Punitive damages are also designed to serve as an example and a warning to discourage anyone else from committing similar acts.

253. The evidence here is clear and convincing. Defendant is so wealthy, powerful, and haughty that a slap on the hand means nothing. In this case, there is no question the bloody glove fits,

is fur-lined, and made from the finest social media leather.

254.  Defendants' actions were undertaken willfully, wantonly, maliciously and in knowing or reckless disregard for Plaintiff's rights. Therefore, Plaintiff seeks exemplary and punitive damages in an amount sufficient to deter said Defendants and others from similar future wrongful and egregious conduct.


SIXTH CLAIM FOR RELIEF

(Proximate Causation Opportunity Loss)


255.  Plaintiff  hereby  re-alleges  and  incorporates  by reference each and every allegation set forth at paragraphs 1 through 254, above, as though fully set forth herein.

256.  Plaintiff is an entrepreneurial company that has been funded by its founder. It is not a Fortune 500 company with abundant resources and in-house legal and on retainer counsel.

257.  Honor is a vital foundation of a functioning society. Thinkers ranging from Montesquieu to Steven Pinker have remarked upon the mindset needed for a culture of honour. Plaintiff states that unless the public policy is for clearly harmed and defrauded parties to do nothing, then it was very clear that a proximate cause of Defendants' egregious wrongdoing was that Plaintiff would have to divert resources including time, money, and focus away from building the business and toward being a private attorney

general for itself in the first instance but in the longer-term for the many other businesses that have realistically been harmed by Defendant's misguided, arbitrary, out-of-step censorship, fraudulent manipulation of its platform, and retaliatory actions. Defendant's haughty 'we will do whatever we want' behavior is conditioned upon its calculous that the costs for an aggrieved party to pursue redress are so onerous that its victims will never be able to fight back.

258.   In addition to its magnificent sheets and blankets, Plaintiff also has in its intellectual property portfolio granted patents on heated versions including blankets where the ergonomic canopy is heated so the feet can lie comfortably and warmly on those cooler nights and Kangapoda sleeping bags so the feet may have additional room, as traditional sleeping bags are very cramped and confining on the feet.

259.   Economists tend to value most everything based upon either an opportunity cost or replacement cost perspective.  With an opportunity cost approach, value is based on what an individual sacrificed to obtain a set of goods, services, or assets. Plaintiff states that it lost five (5) years being assailed and forced to fight back against Defendant and new product areas were impossible to pursue as an example of opportunities lost.

260.   As a direct and proximate result of Defendant's conduct and the facts herein alleged, Plaintiff's business opportunities

were significantly hampered, and Plaintiff lost substantial time and substantial future earnings to be proven at trial.

<u>SEVENTH CLAIM FOR RELIEF</u>

(Attorney's Fees)

261. Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 260, above, as though fully set forth herein.

262. Awards of attorney's fees are designed to help equalize contests between small, private plaintiffs – often functioning as private attorney generals - and large corporate defendants. Thus, attorney's fees provisions are found in civil rights, environmental protection, and consumer protection statutes.

263. The "American rule" has two major common law exceptions delineating instances when federal courts may award attorney's fees without statutory authorization: (i) the common benefit doctrine and (ii) the bad faith doctrine.  Both derive from the historic authority of the courts to do equity in a particular situation. This authority has been called the "supervisory" or "inherent" power of the federal courts.

264. A finding of subjective bad faith entitles either prevailing plaintiffs or defendants to an attorney's fee award under the common law exception to the American rule.

265.  In Hall v. Cole, 412 U.S. 1, 5 (1973), the Supreme Court wrote: "[I]t is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . in this class of cases, the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant."

266.  Vexaciously is a euphemism in this case, and Defendant acted wantonly, in bad faith, and for oppressive reasons (Plaintiff believes criminally as well) almost daily over years. This has all been pled with great specificity above.

267.  The private attorney general doctrine provides that a plaintiff "should be awarded attorney's fees when he has effectuated a strong congressional policy which has benefited a large class of people, and where further the necessity and financial burden of private enforcement are such as to make the award essential." La Raza Unida v. Volpe, 57 F.R.D.94 at 98 (N.D. Cal. 1972).  Many of the statutory exceptions to the American rule are based on this concept. This would be applicable should this court find a private right of action under Section 5 of the FTCA discussed above.

268.  Attorney's fees are also directly incorporated in the Clayton Act and are a critical component of fighting back against

an unregulated giant intent on destroying. Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees. The phrase "injured in his business or property" is interpreted broadly by the courts. This has been discussed fully and substantively in FOURTH CLAIM FOR RELIEF (Anti-Trust) paragraphs 224-285 above.

269. Wherefore, Plaintiff requests payment of reasonable attorney's fees.


EIGHTH CLAIM FOR RELIEF
(Declaratory and Injunctive Relief)


270. Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 269, above, as though fully set forth herein.

271. Plaintiff's complaint specifically details a chain of lying, concealment, and the abrogation of any concepts of honesty, fair play, decorum, or good faith. Moreover, the facts support a conclusion that Defendant feels and functions as if it is above the law. In sync with its entire course of conduct, Plaintiff strongly believes that even a successful outcome will not compel Defendant to act responsibly (i.e., Defendant cannot be trusted).

272.   A private plaintiff can also seek an injunction "against threatened loss or damage by a violation of the anti-trust laws" (section 16, Clayton Act). Unlike section 4, actual injury is not required in a section 16 proceeding; the threat of injury is sufficient (In re New Motor Vehicles Can Exp. Antitrust Litig., 522 F.3d 6 (1st Cir. 2008)). To obtain a preliminary injunction, a plaintiff typically must show all of the following: a likelihood of success on the merits; a threat of irreparable harm with no adequate remedy at law; a threatened injury that outweighs the harm that the injunction may create for the defendant; and the granting of the injunction is in the public interest(15 U.S.C. § 26; Fed. R. Civ. P. 65).

273.   Accordingly, Plaintiff respectfully requests a permanent prohibitory injunction restraining Defendant, its agents, employees, officers, and affilitated social media sites including Defendant's Instagram from taking any further actions to harm Plaintiff and ordering Defendant to properly maintain Plaintiff's Facebook and Instagram pages and provide proper boosts and other functionalities including posting, scheduling, inviting, etc. as if this action were not occurring.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests the following relief against Defendants, and each of them, as follows:

1.  For an award of general, hedonic, special pecuniary and non-pecuniary, and consequential and/or continuing damages from the Defendants, and each of them, according to proof or by operation of law;

2.  For a finding of antitrust violations under the Clayton Act and / or private standing under Section 5 of FTCA and an award of threefold the damages sustained, plus interest, plus the costs of this suit including reasonable attorney's fees;

3.  For an award of exemplary and punitive damages to the extent allowed by law and in an amount according to proof;

4.  For attorneys' fees and costs of suit herein pursuant to statute or as otherwise may be allowed by law;

5.  For preliminary and permanent injunctive and declaratory relief pending final resolution of the case; and,

6.  For such other relief as this Court may deem just and proper.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues triable by right to a jury.

Dated this _____ day of _____ 2021

By: _____

Attorney

EXHIBIT A



EXHIBIT B



EXHIBIT C

EXHIBIT C



EXHIBIT D



**EXHIBIT E**





# EXHIBIT F

## Facebook Blocks

To help keep Facebook safe, we sometimes block certain content and actions. Please let us know if you think we've made a mistake in this case.

Please explain why you think this was an error

I have received this message repeatedly.  This is sabotage.  I invited NONE again today.  That's right NONE.  How is it possible for approximately 2 weeks you have prevented me from inviting ANYONE. I have brought this to your attention repeatedly.

Moreover, I keep getting 'it looks like your account was sending out spam...' This has gone on for too long too.

Something is really rotten in the state of Facebook!

You have destroyed my / Kangapoda's campaign and caused incredible harm.

You will be held accountable.

Thanks for taking the time to submit a report. While we don't reply to every report, we'll let you know if we need more details.

Send



EXHIBIT G

# EXHIBIT H

 Facebook

Tom Sexauer commented on Kangapoda's photo.



**Tom Sexauer**
April 13 at 11:56am

Yw! I love your ads!!

👍 Like    💬 Comment

**View on Facebook**

Reply to this email to comment on this post.

# EXHIBIT I



Wed 11/15/2017 4:33 AM

Hal Mintz <hmintz@kangapoda.com>
**This is Corporate Arson This is Sabotage This is a Felony**

To ◯ 'Facebook'

ⓘ You replied to this message on 1/25/2018 8:17 PM.

If I entered Facebook's premises and destroyed massive amounts of intellectual property...you would want me jailed.

What you have done is the same.  This is such serious, glaring sabotage...that I will file a police report today.  I may even call the FBI.

I am and have been documenting everything.  This will go to Mark Zuckerberg.  As he is directly aware of the prior problems...he is eith

I have at all times acted in good faith.

I have at all times just wanted to have a fun and whimsical social media campaign.  The damage caused has already been documented.

How dare you.  I know this is Facebook...but people should go to jail!

Hal Mintz
President
Kangapoda Corporation

**From:** Hal Mintz [mailto:hmintz@kangapoda.com]
**Sent:** Tuesday, November 14, 2017 11:00 AM
**To:** 'Facebook' <case++aazzqkaqkeiqgo@support.facebook.com>
**Subject:** 6 Months of Ads Are Being Burned

Are you going to allow 6 months of effort / 2 ads a day to be burned up??

Please don't do this / allow this to happen



**EXHIBIT J**

